UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARVIN CALVIN,

                Plaintiff,

-- against --

CITY OF NEW YORK; Department of Correction ("DOC") Commissioner DORA B. SCHRIRO; Chief of Department EVELYN A. MIRABAL; Officer MATTHEW PEDLAR (Shield #4988); Officer ANTONIO BRAVO (Shield #17297); Officer STEPHOND HAWKINS (Shield #23653); and Captain ANNA PRESSLEY (Shield #31706),

                Defendants.

14 Civ. _____

**COMPLAINT AND JURY DEMAND**

ECF CASE



RECEIVED JAN 27 2014 U.S.D.C. S.D.N.Y. CASHIERS

## PRELIMINARY STATEMENT

1. Plaintiff Marvin Calvin brings this civil rights action for injuries caused when he was brutally beaten on January 30, 2013 by uniformed officers employed by the New York City Department of Correction ("DOC" or the "Department") while Mr. Calvin was in the DOC's custody at the Rikers Island Justice Center ("RIJC") intake separation area. Mr. Calvin was brutally beaten by three corrections officers, resulting in serious and permanent injury.

2. DOC staff members beat Mr. Calvin so severely that they fractured vertebrae in his neck and his back, and broke his ribs. DOC staff members also gave Mr. Calvin two black eyes and two deep lacerations to his face requiring ten stitches. Mr. Calvin was forced to wear a hard neck brace for months. He was in excruciating pain, requiring him to take heavy duty prescription pain medication for months. Mr. Calvin continues to this day to suffer severe pain in his lower back and his neck, nine months after the attack. He experiences frequent vision problems. He has trouble sleeping, he is depressed, and he is anxious about his safety in prison

1

while his physical health and strength remain compromised.

3. At the time of this assault, January 30, 2013, the Department and Defendants Schriro and Mirabal were aware—through Department reports and litigation against the City—of the long history of widespread abuse of inmates held in New York City jails, including the use of excessive force by Department members resulting in serious injuries to inmates. They failed to take sufficient action to prevent further misconduct. Their failure to act constitutes deliberate indifference to a substantial and foreseeable risk that Defendants would seriously harm another inmate, and was a cause of Mr. Calvin's injuries.

4. Defendants' actions were contrary to law, and resulted in permanent injury to Mr. Calvin. This complaint, arising from these harmful, outrageous, and unlawful acts, seeks compensatory and punitive damages, costs, and attorneys' fees pursuant to applicable state and federal civil rights law.

**PARTIES**

5. Plaintiff Marvin Calvin is a citizen of the United States and resided at Rikers Island in Bronx County at the time these events occurred. At the time of the beating, Mr. Calvin was detained in the RIJC intake separation area.

6. Defendant City of New York ("City") is a municipal corporation that, through the DOC, operates a number of detention facilities. The Department, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting, and investigation of force by uniformed staff. In addition, senior officials in the Department are aware of and tolerate practices by subordinate employees in the jails, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in

the culture of the agency, constitute unwritten Department policies or customs. The Department is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the Defendants referenced herein.

7. At all times relevant hereto, Defendant Dora B. Schriro was the Commissioner of DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such, and acting under color of state law. On information and belief, Defendant Schriro, as Commissioner of DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the training, supervision, and conduct of all DOC personnel, including the Defendants referenced herein. As Commissioner, Defendant Schriro is also responsible for the care, custody, and control of all inmates housed in the Department's jails. As Commissioner, Schriro was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in the Department jails. In addition, at all relevant times, Defendant Schriro was responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel obey the laws of the United States and of the State of New York. Defendant Schriro is sued in her individual capacity.

8. At all times relevant hereto, Defendant Evelyn Mirabal was the Chief of Department of DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such, and acting under color of state law. As Chief of Department, she was the highest ranking uniformed member of the department, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in all the Department jails. She was also responsible for the care, custody, and control of all inmates in the Department jails. As Chief of Department, Mirabal is provided on a daily basis with reports of

applications of force, allegations of unreported use of force, and other breaches of security in Department jails. Defendant Mirabal is sued in her individual capacity.

9. At all times relevant hereto, Defendant Matthew Pedlar (Shield #4988) was a correction officer employed by DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. On information and belief, Defendant Pedlar worked at the RIJC at the time of the incidents alleged herein, and perpetrated the beating of Mr. Calvin. Defendant Pedlar is sued in his individual capacity.

10. At all times relevant hereto, Defendant Antonio Bravo (Shield #17297) was a correction officer employed by DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. On information and belief, Defendant Bravo worked at the RIJC at the time of the incidents alleged herein, and perpetuated the beating of Mr. Calvin. Defendant Bravo is sued in his individual capacity.

11. At all times relevant hereto, Defendant Stephond Hawkins (Shield #23653) was a correction officer employed by DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. On information and belief, Defendant Hawkins worked at the RIJC at the time of the incidents alleged herein, and participated and/or witnessed and failed to intervene in the beating of Mr. Calvin. Defendant Hawkins is sued in his individual capacity.

12. At all times relevant hereto, Defendant Captain Anna Pressley (Shield #31706) was a correction officer employed by DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such, and acting under color

of state law. On information and belief, Defendant Pressly worked at the RIJC at the time of the incidents alleged herein, and participated and/or witnessed and failed to intervene in the beating of Mr. Calvin. Defendant Pressly is sued in her individual capacity.

13. Defendants Schriro and Mirabal are collectively referred to as the "Supervisory Defendants."

14. Defendants Pedlar, Bravo, Hawkins, and Pressley are collectively referred to as the "Officer Defendants."

## JURISDICTION AND VENUE

15. This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

16. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3)-(4) and 1367(a).

17. The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

18. Plaintiff demands trial by jury in this action.

## FACTUAL ALLEGATIONS

**New York City's Jails: A History of Abuse**

19. For decades, through Department reports and civil litigation, the DOC has been aware of the routine, dangerous, and unconstitutional use of excessive force by staff at individual facilities in the large, multi-jail New York City Department of Correction.[1]

---

[1] *See, e.g., Fisher v. Koehler*, 692 F. Supp. 1519 (S.D.N.Y. 1988), *injunction entered*, 718 F. Supp. 1111 (1989), *aff'd*, 902 F.2d 2 (2d Cir. 1990) (Correction Institution for Men); *Jackson*

5

20. For example, *Sheppard v. Phoenix*, 210 F. Supp. 2d 250 (S.D.N.Y. 1998) (terminating injunction), was a class action that concerned the City's Central Punitive Segregation Unit (CPSU). That litigation unearthed abuse of prisoners and its cover-up, which was sufficiently serious to merit criminal prosecutions of DOC staff members.

21. *Ingles v. Toro*, 438 F. Supp. 2d 203 (S.D.N.Y. 2006) (approving stipulation of settlement), was a system-wide class action challenging the widespread practice of using excessive force against inmates incarcerated in New York City's jails. This litigation revealed significant numbers of credible excessive force complaints from prisoners who had been seriously injured by staff in the City jails. The settlement of this class action was intended to provide meaningful improvements in the training, practice, and supervision of agency staff and investigators, and changes in the Department's use of force policy.

22. In *Nunez, et al. v. City of New York, et al.*, 11-cv-5845 (LTS) (JCF), now pending in this district, twelve plaintiffs are pursuing a class action to remedy the ever-increasing level of unjustified, excessive brutality inflicted by DOC correctional staff on inmates in the City Jails. In that action, the plaintiffs—composed of twelve former inmates, who suffered fourteen different assaults by correctional staff, and sustained injuries ranging from spinal injuries to facial fractures to rib fractures to concussions—have sued the City of New York, DOC Commissioner Schriro, and a number of current and former high-ranking officers to seek declaratory and injunctive relief that would rid the Department of the brutal conduct of its staff.

23. The U.S. Attorney's Office for the Southern District of New York has opened an investigation, under the Civil Rights of Institutionalized Persons Act ("CRIPA"), into

---

*v. Montemagno*, 85 Civ. 2384 (AS) (E.D.N.Y.) (Brooklyn House of Detention); *Reynolds v. Ward*, 81 Civ. 101 (PNL) (S.D.N.Y.) (Bellevue Prison Psychiatric Ward).

staff violence at the Robert N. Davoren Center ("RNDC") directed at adolescents and adults.

24. In addition, there have been a number of recent, highly-publicized incidents of brutal violence in the City's jails. For example, in 2012, correctional staff allegedly beat to death Ronald Spear, a chronically ill inmate, in the North Infirmary Command on Rikers Island after Mr. Spear requested medical care. The Bronx District Attorney's investigation into Mr. Spear's death, which has been determined to be a homicide, is ongoing.

25. In May 2012, a former assistant deputy warden and captain were charged with assaulting an inmate and falsifying use of force reports as part of a cover up, and in June 2012, a probationary captain was prosecuted on similar charges, according to reports in the Village Voice.

26. In 2012, five correctional officers, reportedly acting at the orders of former Assistant Chief of Security Eliseo Perez, Jr., led inmate Jamal Lightfoot into a search pen, and assaulted him, resulting in a fractured eye socket and nose, according to The New York Times. Chief Perez, along with nine other Department staff, including a captain, were reportedly arraigned on criminal charges relating to Mr. Lightfoot's assault and the officers' attempts to hide their misconduct by falsely claiming that Mr. Lightfoot had attempted to assault an officer, and generating false evidence to support those claims.

27. In 2013, it was reported in the media that the Bronx District Attorney's office indicted a captain at the George R. Vierno Center ("GRVC") for an unprovoked assault on an inmate.

28. The pattern and practice of unconstitutional use of force in the City jails is highlighted by ongoing settlements of large sums to settle excessive force lawsuits. Since 2002, the City has expended millions of dollars settling lawsuits filed by inmates who suffered injuries

7

much like the ones experienced by Mr. Calvin. Several recently-settled and pending cases against the Department involve serious allegations of assault by staff and injuries suffered by the plaintiffs. *See Muniz v. City of New York*, No. 12-cv-719 (S.D.N.Y.) (settled for $125,000); *Stanford v. City of New York*, No. 13-cv-1736 (S.D.N.Y.) (18-year-old inmate with fracture to forehead in camera-less search area); *Berrian v. City of New York*, No. 13-cv-1719 (S.D.N.Y.) (inmate with orbital fracture assaulted after reporting to LAS a different assault by staff).

29. Through DOC's elaborate reporting system, the Supervisory Defendants—Schriro and Mirabal—were aware of the pattern of a large number of incidents involving the use of excessive force resulting in serious injuries to inmates and have failed to take sufficient steps to curb these abuses.

30. The Department and the Supervisory Defendants have also been made aware of the failure of the Department to bring disciplinary charges against its officers to promote institutional reform, punish staff who misuse force, and discourage others from doing so.

31. Through all these cases and Department reports, the Supervisory Defendants have been made aware of the widespread practice by DOC staff of using excessive force to injure, and not restrain, inmates. They have also been made aware of the failures of DOC's Investigation Division to adequately investigate allegations of misconduct, a practice that causes further abuse.

32. These Supervisory Defendants cannot credibly contend that they are unaware of the pattern of abuse that occurs with regularity in New York City jails or the failure of the Department to take sufficient measures to investigate and discipline this abuse.

33. The Department has not taken sufficient steps to curb the abuse that occurs

8

on a daily basis in New York City jails. Indeed, it allows that abuse to persist through inadequate investigations of allegations of misconduct and the failure to discipline officers in the face of obvious wrongdoing.

**The January 30, 2013 Assault of Marvin Calvin**

34. On or about January 30, 2013, Mr. Calvin, who had been incarcerated at Rikers Island since December 12, 2012, was taken from his housing unit at the Anna M. Kross Correctional ("AMKC") facility to the Rikers Island Justice Center for a parole hearing.

35. Upon arriving at the RIJC, Mr. Calvin was placed in a separation pen. He was the only inmate in the pen. Mr. Calvin removed his orange jumpsuit and left the pen, wearing his civilian clothes, to see his lawyer.

36. After his meeting with the lawyer, Mr. Calvin was escorted back to the separation pen by Defendant Pedlar. The officer informed Mr. Calvin that he would have to put his orange jumpsuit back on to see the judge. Mr. Calvin refused at first because he wished to wear civilian clothes to see the judge. After considering it a moment, however, Mr. Calvin called out to Defendant Pedlar, intending to tell him he had changed his mind and would put on the jumpsuit so that he could see the judge.

37. Defendant Pedlar left the area without taking Mr. Calvin to see the judge.

38. A second officer approached and informed Mr. Calvin of his next court date, which would be his next opportunity to see the judge.

39. Mr. Calvin was frustrated at not being able to see the judge and resolve the charge against him. Acting on that frustration, Mr. Calvin kicked at the door of his pen and repeatedly flushed the toilet, causing it to flood. He was alone in the pen. At no time did Mr. Calvin threaten anyone. At no time did Mr. Calvin destroy City property. Within five minutes,

9

Mr. Calvin had calmed down.

40. At that point, Defendant Officer Bravo came to the pen in which Mr. Calvin was confined and told Mr. Calvin to come closer to him. When Mr. Calvin failed to comply, Bravo sprayed him directly in his face with pepper spray. The chemical spray hit Mr. Calvin in his right eye.

41. Mr. Calvin turned away from the spray and picked up his sweatshirt to wipe the chemical from his face. He heard Defendant Captain Pressley say to Defendant Bravo, "Spray him!" Defendant Bravo replied, "I already did."

42. Suddenly, Defendants Bravo, Hawkins, and Pedlar entered the pen. One or more of the officers punched Mr. Calvin twice in the face. Mr. Calvin folded over and raised his hands up in front of himself, trying to protect his face.

43. Defendants Bravo, Hawkins, and Pedlar repeatedly punched Mr. Calvin in his ribs, back, and neck. They then pushed him into the divider that separated the toilet, knocking over the divider. Throughout this period, Bravo, Hawkins, and Pedlar continued to punch and kick Mr. Calvin.

44. Defendants Pressly did not enter the pen, but witnessed the attack. She never attempted to intervene or protect Mr. Calvin.

45. Mr. Calvin heard a loud "BANG," and the pen grew darker. On information and belief, the officers had shattered the light fixture in the ceiling with the pole that held up the toilet divider.

46. Mr. Calvin attempted to escape this beating. Just as he reached the door of the pen, however, the officers pulled him back by his clothes and threw him down onto the ground.

47. For a second time, Mr. Calvin tried to flee his attackers. This time, he made it into the hallway outside the pen before the officers attacked him again, spilling into the pen across the hall. Mr. Calvin received numerous punches and kicks to the back of his neck. The officers repeatedly cursed at him.

48. One of the officers told him to put his arms behind his back. Mr. Calvin believed that the beating was finally over, and he dropped his arms from in front of his face to comply with the order.

49. At that moment, Defendant Bravo grabbed Mr. Calvin's hand, holding it back and pushing the side of his face against the wall. While he restrained Mr. Calvin, he punched Mr. Calvin's eye multiple times. Defendant Bravo and/or the other Officer Defendants punched Mr. Calvin's neck.

50. Mr. Calvin sustained two deep gashes to his face, one laceration below his right eye and one above his left eye. Both of these lacerations would require stitches.

51. Mr. Calvin's eye was badly bruised and swollen shut.

52. Although Mr. Calvin did not know it yet, the officers fractured multiple vertebrae in Mr. Calvin's neck and lower back, and broke several of his ribs.

53. Finally, the officers ceased beating Mr. Calvin.

54. Because Mr. Calvin's face was covered in blood, Defendant Bravo ordered him to wash his face off. When the sink was not working, Bravo ordered Mr. Calvin to use the toilet water. Mr. Calvin refused.

55. Mr. Calvin was handcuffed and taken back to the intake area at the AMKC. He was forced to wait there for an hour before he was finally taken to the clinic. At the intake area, the intake captain told Mr. Calvin to clean off his face because they did not want the

11

pepper spray in the clinic. Mr. Calvin refused to do so until photographs of his injuries were taken. At that point, staff took photos of Mr. Calvin's body and face, documenting his injuries.

56. Finally, Mr. Calvin was taken to the clinic. The seriousness of Mr. Calvin's injuries were so obvious to the clinic staff that he was immediately placed on a stretcher with a neck brace and sent by ambulance to the emergency room at Elmhurst Hospital Center in Queens, New York.

57. At the hospital, Mr. Calvin was given numerous tests, including a cervical spine CT scan. That test revealed a fracture of the spinous processes of the C5 and C6 vertebrae, in his lower neck. Mr. Calvin also received six stitches under his right eye and four stitches above his left eye. His treating physician told him that his injuries were caused by a blunt object.

58. Following the attack and his return from the hospital, Mr. Calvin remained at the NIC for approximately three weeks.

59. His pain continued. It was not until late April—three months after the brutal beating—that he was finally diagnosed with broken ribs and fractured vertebrae in his lower back, in addition to those at the base of his neck. A neurologist at Bellevue Hospital eventually diagnosed Mr. Calvin with having sustained spinous process fractures at the C5 and C6 vertebrae, at the base of his neck; transverse process fractures to the left L2, L3, and L4 vertebrae, in his lower back; and left 11th and 12th posterior rib fractures.

60. Mr. Calvin was in excruciating pain following this brutal attack, particularly in his lower back. He was prescribed Tylenol #3 with codeine. He was forced to wear a hard neck brace for approximately three months.

61. Despite the strong medication, Mr. Calvin continued to suffer extreme pain. Nearly two months after the attack, he told the neurosurgeon at Bellevue Hospital that he

had severe lower back pain. He also requested the use of a cane, because walking caused him so much pain.

63. He remains in pain even now, nearly a year after the attack. He has also gone through over six weeks of physical therapy for his neck, and has requested physical therapy for his lower back.

63. Beyond his extreme physical pain that lasts to this day, Mr. Calvin suffered mental anguish from the attack. He suffered depression and had trouble sleeping. Most of all, he experienced extreme anxiety about his own safety in the jail, worried that he could not protect himself given his physical state.

64. Mr. Calvin timely filed a written notice of claim with the Comptroller's Office at 1 Centre Street, New York, New York.

65. More than 30 days have passed since the filing of the notice of claim, and the City has not settled the action.

66. This action has been commenced no more than three years after the happening of the events upon which the claims are based.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983/Fourteenth Amendment**
**(Against Officer Defendants)**

67. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

68. By reason of the foregoing, and by assaulting, battering, and using gratuitous, excessive, brutal, sadistic, and unconscionable force against Mr. Calvin, or failing to prevent other Officer Defendants from doing so, the Officer Defendants deprived Plaintiff of

13

rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment of the United States Constitution.

69. Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employments as DOC officers or supervisors. Said acts by Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. These Defendants acted willfully, knowingly, and with the specific intent to deprive plaintiff of her constitutional rights secured by 42 U.S.C. § 1983, and the Fourteenth Amendment of the United States Constitution.

70. As a direct and proximate result of the Officer Defendants' misconduct detailed above, Plaintiff sustained the damages hereinbefore alleged.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983/Fourteenth Amendment
### (Against Supervisory Defendants)

71. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

72. Defendants Schriro and Mirabal were at all relevant times supervisors of the officers directly involved in this incident.

73. Defendants Schriro and Mirabal knew that the pattern of physical abuse described above existed in the City jails prior to and including the time of the assault on Plaintiff. Their failure to take measures to curb this pattern of brutality constitutes deliberate indifference to and acquiescence in the known unlawful behavior of their subordinates. The prevalence of these practices and general knowledge of their existence at the time of Plaintiff's beating, and the failure of these Defendants to take remedial action despite the fact that the misuse of force in city

jails had been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including Plaintiff. These Defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint.

74. By failing to remedy the wrongs committed by their subordinates, in failing to properly train, screen, supervise, or discipline their subordinates, and by personally participating in the constitutional injuries set forth above, the Supervisory Defendants caused damage and injury in violation of Plaintiff's rights guaranteed under the United States Constitution, including its Fourth and Fourteenth Amendments, through 42 U.S.C. § 1983.

75. As a direct and proximate result of the foregoing, Plaintiff sustained the damages alleged herein.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983/Fourteenth Amendment**
**(Against Defendant City)**

76. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

77. Defendant City, through DOC, and acting under the pretense and color of law, permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff at the time of Plaintiff's beating. This widespread tolerance of correction officer abuse of prisoners constituted a municipal policy, practice or custom and led to the assault of the Plaintiff.

78. By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which plaintiff was subjected to a brutal beating, Defendant City has deprived Mr. Calvin of rights, remedies, privileges, and immunities

15

guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed under the Fourteenth Amendment to be free from gratuitous and excessive force and retaliation.

79. As a direct and proximate result of the policy, practice and custom detailed above, Plaintiff sustained the damages hereinbefore alleged.

**FOURTH CLAIM FOR RELIEF**
**Negligent Hiring/Training/Retention of**
**Employment Services**
**(Against Defendant City)**

80. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

81. Defendant City, through the DOC, owed a duty of care to Plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person would have anticipated that injury to Plaintiff or to those in a like situation would probably result from its conduct, described herein.

82. Upon information and belief, all of the Individual Defendants were unfit and incompetent for their positions.

83. Upon information and belief, Defendant City knew or should have known through the exercise of reasonable diligence that the Individual Defendants were dangerous.

84. Upon information and belief, Defendant City's negligence in screening, hiring, training, disciplining, and retaining the Individual Defendants proximately caused each of Plaintiff's injuries.

85. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages alleged herein.

# FIFTH CLAIM FOR RELIEF
## Assault and Battery
### (Against Defendant City and Officer Defendants)

86. Plaintiff repeats and realleges each of the foregoing paragraphs as if they were fully set forth at length herein.

87. In assaulting, battering, and threatening Plaintiff, or standing by and failing to intervene when Plaintiff was assaulted, the Officer Defendants, acting in their capacities as DOC officers, and within the scope of their employment, each committed a willful, unlawful, unwarranted, and intentional assault and battery upon Plaintiff.

88. The assault and battery by the Officer Defendants was unnecessary and unwarranted in the performance of their duties as DOC officers and constituted an unreasonable and excessive use of force.

89. Defendant City, as employer of the Officer Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

90. As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

1. Compensatory damages in an amount to be determined at trial for the physical and psychological injuries sustained by Mr. Calvin as a result of the events alleged herein.

2. Punitive damages against the Officer Defendants and the Supervisory

_____
Jonathan S. Abady
Katherine Rosenfeld
Alison Frick
75 Rockefeller Plaza
New York, New York 10019
(212) 763-5000

THE LEGAL AID SOCIETY
PRISONERS' RIGHTS PROJECT

Jonathan S. Chasan
Mary Lynne Werlwas
199 Water Street, 6th Floor
New York, New York 10038
(212) 577-3530

*Counsel for Plaintiff*